\_\_\_\_ Priority
\_\_\_\_ Send
\_\_\_\_ Clsd
\_\_\_\_ Enter
\_\_\_\_ JS-5/JS-6
\_\_\_\_ JS-2/JS-3
          *O*



FILED
CLERK, U S DISTRICT COURT

AUG 26 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> MATTEL, INC., a Delaware Corporation, and DOES 1-10, <br><br> Defendants. | CASE NO. CV 05-2727 NM (RNBx) <br><br><br> ORDER AND OPINION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND STRIKE PORTIONS OF COMPLAINT |

## I. INTRODUCTION

On April 13, 2005, plaintiff MGA Entertainment, Inc. ("MGA") initiated this action against rival toy doll maker, defendant Mattel, Inc. ("Mattel"). MGA contends that it "seeks by this action to halt Mattel's habitual and unfair tactics of competition-by-intimidation and serial copycatting of MGA's products." Compl. ¶ 7. The Complaint asserts causes of action for: (1) False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125(a); (2) Unfair Competition in Violation of 15 U.S.C. § 1125(a), Cal. Bus. & Prof. Code § 17200 et seq., and California Common Law; (3) Dilution in Violation of 15 U.S.C. § 1125(c), Cal. Bus. & Prof. Code § 14330, and California Common Law; and (4) Unjust Enrichment. On May 13, 2005, Mattel filed the instant Motion to Dismiss and

DOCKETED ON CM

AUG 26 2005

BY            010

Strike Portions of Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), 12(f), and 12(b)(1). For the reasons set forth below, Mattel's motion is GRANTED in part and DENIED in part.

## II. FACTUAL & PROCEDURAL BACKGROUND[1]

MGA's Complaint is divided into four parts: (1) background factual allegations, see Compl. ¶¶ 7-30; (2) allegations regarding Mattel's "serial copycatting" of MGA's products, see id. ¶¶ 31-73; (3) allegations regarding Mattel's "strong-arm tactics, and other illegitimate, unfair and anti-competitive" conduct, id. ¶¶ 74-100; and (4) MGA's causes of action and claims for relief, id. ¶¶ 101-25.

### A. Background Factual Allegations

In paragraphs 7 through 30 of the Complaint, MGA provides various background factual allegations. See id. ¶¶ 7-30. In particular, this section of the Complaint details how Mattel came to dominate the fashion doll market in the twentieth century through sales of its mainstay product, "Barbie"; how both the public's interest in Barbie and Mattel's success began to wane in the late 1990s; and how MGA's 2001 release of its new and "fresh-looking" doll line, the "Bratz," came at just the right time to take advantage of the public's growing apathy for Barbie. See id.[2] The Complaint uses these facts to set the scene for MGA's claim that Mattel was "in trouble," and had to do something to regain the market share it was losing to MGA. MGA then alleges that Mattel, rather than "respond . . . with a new, creative product of its own," decided to "wage[] war against MGA using a

---

[1] The following facts from the Complaint are assumed true for purposes of this motion only.

[2] MGA describes the Bratz as "multi-ethnic fashion dolls that sport a fresh new urban and contemporary look and fashion." Compl. ¶ 8.

2

wide-array of tortious, unfair and anti-competitive practices including systematic, serial copycatting and intellectual property infringement, aided by intimidation, threats and other acts of unfair competition and anti-competitive conduct." Id. ¶ 32.

## B. Serial Copycatting

In the second section of the Complaint, paragraphs 33 through 73, MGA alleges that Mattel responded to the competition posed by the Bratz by creating and marketing various dolls and products that infringed on the trade dress of the Bratz and MGA's other products. See id. ¶¶ 33-73. In particular, MGA alleges that Mattel introduced a line of dolls in October 2002 called "My Scene" that infringed on the Bratz's trade dress. Id. MGA also contends that Mattel's "serial copycatting" "extended to MGA's packaging, themes, accessories, advertising and even other product lines." Id. Finally, MGA mentions a failed Mattel doll line called the "Flavas." See id. ¶ 35. MGA suggests that Mattel's My Scene dolls "may have been . . . intended to buy Mattel time while it worked to release . . . 'Flavas.'" Id. However, according to MGA, the Flavas failed in the market because they "took the urban, 'hip-hop' look too far, and were widely viewed as portraying a trampy, 'bad-girl' image." Id.

## C. Unfair, Manipulative, and Anti-Competitive Conduct

In the third section of the Complaint, entitled "Mattel's additional unfair, manipulative, anti-competitive conduct," MGA alleges that Mattel has engaged in "strong-arm tactics, and other illegitimate, unfair and anti-competitive means . . . to manipulate the market and ensure that its control and domination of the industry can continue unabated." Id. ¶ 74. See id. ¶¶ 74-100. Because Mattel's Motion focuses on this portion of the Complaint, a detailed description is in order.

MGA first alleges that "Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of

3

Mattel employees." Id. ¶ 75 (emphasis in original). Additionally, MGA alleges, "Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004." Id. According to MGA, this lawsuit was dismissed with prejudice because Mattel's Complaint "fail[ed] to state a viable claim" and Mattel could not "muster up a shred of evidence sufficient to support an amended complaint." Id.

MGA next alleges that Mattel has intimidated various companies, such as publishing entities, into not doing business with MGA. Id. ¶ 76.[3] Similarly, MGA alleges that "Mattel has used . . . intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute Bratz, to reduce shelf and display space for Bratz and to place Bratz in unfavorable locations at retail outlets." Id. ¶ 77.

MGA also alleges that Mattel has tried to lock MGA out of the market by buying up the supply of necessary products. In particular, MGA contends: "When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies." Id. ¶ 78.

MGA further accuses Mattel of "manipulat[ing] the retail market." Id. ¶ 79. For example, MGA asserts: "Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with

---

[3] In particular, MGA alleges:

Mattel has . . . warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "Bratz." While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

Compl. ¶ 76.

4

Mattel merchandise." Id. ¶ 79. Additionally, "Mattel . . . falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing and falsely told a United Kingdom retailer that MGA was discontinuing one of its lines, in order to make such line less attractive to buyers and thereby attempt to increase sales of the competitive Mattel product and improve its own sales, at MGA's expense." Id.

MGA then details how "[e]ven supposedly unbiased and impartial industry organizations have fallen prey to Mattel's abusive wield[ing] of power, to MGA's detriment." Id. ¶ 80. For example, MGA alleges:

> NPD Funworld ("NPD") . . . is the leading supplier of sales statistics in the toy industry. Accurate NPD statistics are essential for efficient product-line management. Without these statistics, it is difficult, if not impossible, for toy companies to assess and measure the relative success of their products in key categories. It is, however, a subscription service, and NPD restricts the manner in which its subscribers may use the data it provides. Mattel has regularly ignored the restrictions . . . . Mattel generates substantially more annual subscription revenue for NPD than does MGA, and carries more clout. After MGA had subscribed to the service for more than 12 years, NPD terminated MGA's subscription in 2003 theoretically on the grounds that MGA misused NPD data in a press release. MGA is informed and believes that the termination was the result of pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's restrictions.
>
> In addition to this, the market share numbers that NPD generates are heavily dependent on the category in which NPD places a particular product. MGA is informed and believes that Mattel also pressured NPD into changing certain product classifications for its Bratz products in order to manipulate the data and preserve Mattel's market share rankings in the critical fashion doll category – and thereby lower MGA's.

The Children's Advertising Review Unit ("CARU") is . . . is the toy industry's supposedly independent self-regulatory body in charge of maintaining standards in advertising. . . . CARU is heavily subsidized by Mattel. . . . Upon information and belief, Mattel has used its influence as a major contributor to CARU's budget to induce CARU to place onerous restrictions on MGA advertisements, and require MGA to amend aspects of commercials that have gone unchallenged in other parties' commercials. . . .

Even [the Toy Industry Association ("TIA")], the toy industry's trade association, is apparently not untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-the-Year Awards, the most prestigious of which had been the award for Toy of the Year. Winning the Toy of the Year Award is a significant achievement that not only very likely increases the sales of the winning toy, but also denotes the winning company as a leader in toy innovation and generates substantial goodwill with retailers, distributors, licensees, and customers.

For the years 2000 . . ., 2001 and 2002, the Toy of the Year award was chosen by consumer vote. . . . Leap Frog won the 2000 . . . Award and MGA won [in] 2001 and 2002. . . . With the 2003 . . . Award, however, the rules suddenly changed. Now, the award is selected by members of the industry. Upon information and belief, this change was orchestrated by a Fisher Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of TIA. Perhaps not surprisingly given this change in the winner selection procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year 2003 . . ., beating out the other leading nominee, "Bratz Formal Funk Super Stylin' Runway Disco."

TIA has refused to provide MGA with the vote count procedure and totals for this award, despite repeated requests.

MGA is also informed and believes that Mattel was instrumental in attempting to keep MGA from participating as a sponsor in this year's "Kids' Choice Awards."

Compl. ¶¶ 81-97.

Finally, MGA alleges:

> Mattel has clearly engaged in tortious, illegal and unethical behavior
> in its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this
> is apparently Mattel's current *modus operandi* when it comes to
> "competing" in the industry. The once immensely successful
> "LeapFrog" interactive learning product, for example, has apparently
> been one of Mattel's other recent victims. '

Id. ¶ 98.

## D. Causes of Action and Claims for Relief

In the last section of the Complaint, MGA asserts the following four causes
of action: (1) "False Designation of Origin in Violation of 15 U.S.C. § 1125(a)";
(2) "Unfair Competition in Violation of 15 U.S.C. § 1125(a) and Unfair
Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof. Code
§ 17200 et seq. and California Common Law"; (3) "Dilution in Violation of 15
U.S.C. § 1125(c); Cal. Bus. & Prof. Code § 14330 and California Common Law";
and (4) "Unjust Enrichment." Among other remedies, MGA requests restitution
and disgorgement. Id. ¶ 118; Prayer ¶ 3(b).

On April 13, 2005, MGA filed the Complaint against Mattel. On May 13,
2005, Mattel filed the instant Motion to Dismiss and Strike Portions of Complaint
Pursuant to Fed. R. Civ. P. 12(b)(6), 12(f), and 12(b)(1).


## III. LEGAL STANDARD

A Rule 12(b)(1) motion is a challenge to the court's jurisdiction over a
matter. See Fed. R. Civ. P. 12(b)(1). The plaintiff bears the burden of
establishing that the court has subject matter jurisdiction to hear the action.
Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994); Stock West v.
Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir. 1989).

7

Under Rule 12(b)(6), a motion to dismiss should be granted only if it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). See also Fed. R. Civ. P. 12(b)(6). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969); Everest and Jennings, Inc. v. American Motorists Ins. Co., 23 F.3d 226, 228 (9th Cir. 1994). All reasonable inferences are to be drawn in favor of the plaintiff. Jacobson v. Hughes Aircraft, 105 F.3d 1288, 1296 (9th Cir.1997).

Finally, under Rule 12(f), the court has the discretion to strike a pleading or portions thereof. Federal Sav. and Loan v. Gemini Management, 921 F.2d 241, 243 (9th Cir. 1990). See also Fed. R. Civ. P. 12(f). Rule 12(f) provides that a court "may order stricken from any pleading . . . any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir.1993) (citing 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 706-07 (1990)), rev'd on other grounds, 510 U.S. 517 (1994). "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." Id. "[T]he function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial . . . ." Sidney-Vinson v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983). Such motions are "generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." Rosales v. Citibank, Federal Sav. Bank, 133 F. Supp. 2d 1177, 1179 (N.D. Cal. 2001). Any doubt concerning the import of the allegations to be stricken weighs in favor of

1  denying the motion to strike. See In re 2TheMart.com, Inc. Sec. Litig., 114 F.
2  Supp. 2d 955, 965 (C.D. Cal. 2000).

3

SCANNED

## IV. ANALYSIS

5      Mattel argues that the court should dismiss and/or strike: (1) the majority of
6  the first section of the Complaint, which consists of the background factual
7  allegations; (2) the third section of the Complaint, entitled "Mattel's additional
8  unfair, manipulative, anti-competitive conduct," as well as related parts of the
9  Complaint, including MGA's request for restitution and disgorgement;
10  (3) specifically paragraph 98 of the Complaint, which includes allegations
11  regarding Mattel's "modus operandi" and LeapFrog; and (4) paragraph 75 of the
12  Complaint, which alleges that Mattel has harassed employees who have left Mattel
13  for MGA.

### A. First Section of Complaint – Background Factual Allegations

15      Mattel argues that the court should strike the background factual allegations
16  contained in paragraphs 11-20 and 30-31 of the Complaint. According to Mattel,
17  these paragraphs, which primarily discuss Mattel's financial and corporate history,
18  are immaterial to MGA's case. MGA responds that these paragraphs should not
19  be stricken because they help elucidate Mattel's motive/intent in creating the My
20  Scene dolls and the various other products that allegedly infringe upon the trade
21  dress of the Bratz and MGA's other products, in violation of the Lanham Act, 15
22  U.S.C. § 1125(a).

23      In the Ninth Circuit, trade dress "refers to the 'total image of a product' and
24  may include features such as size, shape, color, color combinations, texture or
25  graphics." International Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822
26  (9th Cir. 1993); Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 613 (9th Cir.
27  1989). To establish trade dress infringement, a plaintiff must show: (1) that its

28

product design is non-functional, (2) that the design is inherently distinctive or has
acquired a secondary meaning, and (3) that there is a likelihood of confusion.
Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1005 (9th Cir.
1998); Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042,
1046-47 (9th Cir. 1998); International Jensen, Inc. v. Metrosound U.S.A., Inc., 4
F.3d 819, 823 (9th Cir. 1993). The "intent" of the alleged infringer may be
relevant to both the second and third elements of this test. See Fuddruckers, Inc.
v. Doc's B.R. Others, Inc., 826 F.2d 837, 844-45 (9th Cir. 1987) (evidence of
deliberate copying may support inference of secondary meaning); AMF, Inc. v.
Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979) (factors considered in
determining "likelihood of confusion" include intent of defendant in selecting
allegedly infringing mark); id. at 354 (when infringer knowingly adopts mark,
court can presume public will be deceived).

MGA's background factual allegations regarding Mattel's corporate and
financial history set the scene and circumstantially bolster MGA's claim that
Mattel intentionally copied MGA's trade dress. In particular, these allegations
paint a picture of an industry giant which had recently fallen on hard times and
was willing to do whatever was necessary to stop the hemorrhaging and eliminate
the rising tide of competition stemming from a new company with a drastically
different product. According to MGA, Mattel, because of its corporate culture and
history, was unable to "nimbly respond . . . with a new, creative product of its
own." Compl. ¶ 31. Instead, Mattel (intentionally) copied the Bratz and released
its My Scene line. Mattel's financial and corporate history – and, particularly, its
vulnerability at the time of the Bratz's release – play into MGA's theory that
Mattel intentionally copied MGA's trade dress. Accordingly, paragraphs 11-20

1  and 30-31 of the Complaint are not "immaterial," and Mattel's motion to strike

2  these paragraphs is denied.[4]

3  **B. Third Section of Complaint – "Mattel's Additional Unfair, Manipulative,**

4  **Anti-Competitive Conduct"**

5      Mattel argues that the court should dismiss and/or strike the third section of

6  the Complaint, entitled "Mattel's additional unfair, manipulative, anti-competitive

7  conduct," as well as various other related allegations. According to Mattel, these

8  allegations, contained in paragraphs 74-100, 113-114, and 118 of the Complaint,

9  are not material to any of MGA's causes of action. Furthermore, Mattel contends

10  that the court should strike MGA's request for restitution and disgorgement.

11  1.  Materiality and/or Relevance

12      MGA responds to Mattel's first argument by asserting that the allegations in

13  the third section of the Complaint are relevant and/or material to both its trade

14  dress claims and its unfair competition claims.

15              *a. Relevance to Trade Dress Claims*

16      MGA argues that the allegations in the third section of the Complaint are

17  relevant to its trade dress claims because they help elucidate Mattel's "intent."

18      The relevant "intent" for purposes of a trade dress claim (and the likelihood

19  of confusion analysis) is the defendant's "intent to deceive the public" or the

20

---

21      [4] For the same reason, the court denies Mattel's motion to strike paragraph 35 of

22  the Complaint, which provides relevant background information regarding the purpose of
    Mattel's release of the My Scene dolls and its release of the "Flavas." See Compl. ¶¶ 35-

23  36 ("[Mattel's My Scene dolls,] [the] confusingly similar Bratz imitators[,] may have

24  been originally intended to buy Mattel time while it worked to release another product the
    following summer, called 'Flavas.' . . . The [Flavas] were not well-received. . . . Mattel

25  has seemingly abandoned this line. Realizing that 'My Scene' was its best bet for riding

26  MGA's successful coattails and capitalizing on the unique and inherently distinctive look
    that MGA had developed in its 'Bratz' dolls – and MGA's substantial goodwill – Mattel

27  has systematically proceeded to modify the 'My Scene' dolls since their original release,

28  particularly their eyes, to increase their similarity to 'Bratz' more and more over time.").

"intent of deriving benefit from the reputation of the [plaintiff's] trade-mark or trade name." Brookfield Commc'n, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1059 (9th Cir. 1999). See also Toho Co., Ltd. v. Sears, Roebuck & Co., 645 F.2d 788, 791 n. 2 (9th Cir. 1981) ("In order to raise the inference of a likelihood of confusion, a plaintiff must show that the defendant intended to profit by confusing consumers."); J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:113 (2005) ("[W]hen the accused infringer's state of mind is introduced as relevant to the liability issue of the likelihood of confusion, . . . the only relevant intent is intent to confuse.").

· The allegations contained in the third section of the Complaint do not help demonstrate that Mattel had this particular "intent" when it created the My Scene dolls or any other allegedly infringing product. For example, Mattel's alleged "intent to deceive the public" in creating the My Scene dolls or its intent to "derive benefit from the reputation" of MGA's Bratz is not evidenced by the fact that "Mattel has sent threatening letters to several of its former employees" or has intimidated others into not dealing with MGA. These alleged facts, and the others asserted in the third section of the Complaint, demonstrate that Mattel is a fierce (and perhaps unfair) competitor, not that it acted with an "intent to deceive" in creating its products. Therefore, the third section of the Complaint cannot be sustained on the ground that it supports MGA's trade dress claims.[5]

### b. Relevance to Unfair Competition Claims

MGA also argues that the allegations in the third section of the Complaint support its claim for "unfair competition" under Cal. Bus. & Prof. Code § 17200 et seq.

---

[5] This same reasoning applies to defeat MGA's arguments that the third section of the Complaint supports MGA's claims for attorneys' fees, injunctive relief, and "unfair competition" under the Lanham Act, 15 U.S.C. § 1125(a). The relevant "intent" raised by each of these claims is the same as that raised by MGA's trade dress claims.

California Business and Professions Code section 17200 et seq. (the "Unfair Competition Law" or "UCL") prohibits, among other things, "unfair business acts or practices." Id. California courts have generally defined "unfair" broadly under the UCL in order to "provide the courts with the maximum discretion to prohibit new schemes to defraud." National Rural Telecomm. Coop. v. DirectTV, Inc., 319 F. Supp. 2d 1059, 1075 (C.D. Cal. 2003) (Baird, J.) (citing Motors, Inc. v. Times Mirror Co., 102 Cal. App. 3d 735, 740 (1980)). See also People ex rel. Renne v. Servantes, 86 Cal. App. 4th 1081, 1095 (2001) ("The [UCL] is intentionally broad to give the court maximum discretion to control whatever new schemes may be contrived, even though they are not yet forbidden by law.").

In Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. ("Cel-Tech"), 20 Cal. 4th 163 (1999), the California Supreme Court clarified the definition of "unfair" insofar as it applies to cases between direct competitors, such as that now before the court. In particular, the Cel-Tech court turned for guidance to section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a), and stated:

> When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

Id. at 186-87.

Here, MGA claims that Mattel's conduct alleged in the third section of the Complaint "violated the policy or spirit" of the antitrust laws "because its effects were comparable" to a violation of those laws, and/or "otherwise significantly

13

threatened or harmed competition." At this early stage in the proceedings, assuming all facts and all reasonable inferences in MGA's favor, the court agrees.

MGA alleges that Mattel has chosen to "compete" with MGA (and others in the industry) not by creating a better product or lowering its prices, but by using its extraordinary market power to unfairly preclude other companies and brands from entering and competing. For example, MGA alleges that Mattel has used its massive influence to corruptively cause industry groups to discriminate against MGA even though MGA needs to be associated with these groups to exist, survive, and thrive in the industry. See Compl. ¶¶ 81-96. Similarly, MGA contends that Mattel has used its great market power, which included a 90% share of the fashion doll market in 1997, to intimidate others into not dealing with MGA. Id. ¶¶ 74-77. MGA also asserts that Mattel has intentionally engaged in schemes to buy up supplies to lock MGA (and others) out of the market. Id. ¶ 78. Finally, Mattel employees have allegedly been caught tampering with MGA's displays, and have lied to others about MGA's products. Id. ¶ 79.

At this early stage in the proceedings, the court cannot say that this collective conduct is consistent with the "policy and spirit" of the antitrust laws, and/or provides no "significant threat or harm" to competition. In Cel-Tech, itself, the California Supreme Court stated that "the purpose of the antitrust law is 'to foster and encourage competition' by prohibiting 'practices by which fair and honest competition is destroyed or prevented.'" Cel-Tech, 20 Cal. 4th at 186 (quoting Cal. Bus. & Prof. Code § 17001). See also Northeast Airlines, Inc. v. World Airways, Inc., 262 F. Supp. 316, 319 (D. Mass. 1966) ("we believe that the purpose of destroying a competitor by means that are not within the area of fair and honest competition is a purpose that clearly subverts the goal of the [antitrust laws]"). Similarly, it is recognized that the federal antitrust laws were "designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." See William Meade Fletcher, 10A

14

Fletcher Cyclopedia f the Law of Private Corporations § 4981 (2004) (discussing the Sherman Act). Mattel, by its above-mentioned conduct, has prevented "fair competition" from occurring and has undermined "free and unfettered competition."

Additionally, the antitrust laws and the FTCA have been applied to enjoin conduct arguably similar to Mattel's. Compare Compl. ¶¶ 75-77 (alleging that Mattel, using its extraordinary market power, has intimidated employees, publishing entities, distributors, and retailers into not doing business with and discriminating against MGA), with Federal Trade Commission ("FTC") v. Brown Shoe Co., 384 U.S. 316, 321 (1966) ("basic policies" of antitrust laws violated when second largest shoe manufacturer employed extremely attractive program that required retailers "substantially to limit their trade with [manufacturer's] competitors"); Adolph Coors Co. v. FTC, 497 F.2d 1178 (10th Cir. 1974) (affirming FTC finding that powerful supplier violated FTCA by coercing distributors and retailers into participating in a variety of anticompetitive conduct, including excluding products of supplier's competitor); Union Circulation Co. v. FTC, 241 F.2d 652, 655-56 (2d Cir. 1957) (affirming FTC finding that defendants violated FTCA by "coercing" others into not doing business with defendants' competitor); Hastings Mfg. Co. v. FTC, 153 F.2d 253 (6th Cir. 1946) (affirming FTC finding that defendant violated FTCA by using various means to induce distributors into refusing to handle competitors' products); Carter Carburetor Corp. v. FTC, 112 F.2d 722, 734-36 (8th Cir. 1940) (affirming FTC finding that powerful supplier violated FTCA by "inducing, coercing and compelling many independent [retailers] to cancel existing sales contracts with . . . competitor and to cease and refuse to deal in the products of such competitor"); FTC v. Wallace, 75 F.2d 733 (8th Cir. 1935) (affirming FTC finding that defendant coal dealers violated FTCA by intimidating and threatening to boycott suppliers that dealt with competitors); Amarel v. Connell, 202 Cal. App. 3d 137, 142, 145 (1988) (plaintiff

rice growers stated antitrust claim against powerful vertically-integrated competitors, in part, because competitors refused to do business with those who dealt with plaintiffs' customers); Kolling v. Dow Jones & Co., Inc., 137 Cal. App. 3d 709 (1982) (violation of antitrust laws for supplier to threaten, intimidate, and coerce distributor into participating in anticompetitive conduct); R.E. Spriggs Co., Inc. v. Adolph Coors Co., 94 Cal. App. 3d 419, 425 (1979) (violation of antitrust laws for supplier to force distributors into anticompetitive behavior "through suggestions which the distributors could not refuse"). Compare Compl. ¶ 78 (alleging Mattel bought up supply of doll hair from two largest suppliers to lock MGA out of market), with Amarel, 202 Cal. App. 3d at 142, 145 (plaintiff rice growers stated antitrust claim against integrated competitors, in part, because competitors locked plaintiffs' customers out of ports necessary for business). Compare Compl. ¶ 79 (alleging Mattel manipulated market by lying about MGA's products), with Northeast Airlines, Inc., 262 F. Supp. at 319 ("[W]e believe that the purpose of destroying a competitor by means that are not within the area of fair and honest competition is a purpose that clearly subverts the goal of the [anti-trust laws]. . . . The making of false and disparaging statements about a competitor . . . [is] 'not within the area of fair and honest competition.'").

Thus, at least at this stage in the proceedings, the court finds that the allegations in the third section of MGA's Complaint support a claim for "unfair competition" under the UCL.[6] Accordingly, the court denies Mattel's motion to

---

[6] Mattel attempts to avoid this result by relying upon Cel-Tech's statement that "the antitrust laws were enacted for the protection of competition, not competitors." Cel-Tech, 20 Cal. 4th at 186 (internal quotation marks omitted) (emphasis omitted) (quoting Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 115 (1986)). Although true, this statement does not aid Mattel because MGA's UCL claim does seek to protect "competition," not just "competitors." The essence of MGA's claim is that Mattel has engaged in conduct stifling fair "competition," not that competitors can only compete

(continued . . .)

16

1    strike paragraphs 74-100, 113-114, and 118 of the Complaint.[7]

2    2.    Request for Restitution and Disgorgement

3         Mattel argues that regardless, the court should strike MGA's request for

4    restitution and disgorgement insofar as it relates to MGA's UCL claim.  Mattel's

5    argument is rejected.  First, it is undisputed that MGA's request for restitution and

6    disgorgement will remain in the Complaint regardless, because the request is

7    potentially relevant to MGA's other claims.  Compare Opp. at 21 ("[Restitution

8    and disgorgement] [are] entirely proper [forms of relief] under the Lanham Act

9    and California common law, and Mattel does not contest this."), with Rep. at 10

10   (failing to respond to this argument).  Second, and more important, restitution and

11   disgorgement are sometimes appropriate remedies under the UCL.  See Korea

12   Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1148 (2003) (under UCL,

13   "an individual may recover profits unfairly obtained to the extent that these profits

14   represent monies given to the defendant or benefits in which the plaintiff has an

15   ownership interest."); id. at 1444, 1148 (UCL allows for "disgorgement" of profits

16   that is "restitutionary in nature").  See also Inline, Inc. v. A.V.L. Holding Co., 125

17   _____

18   with Mattel (when Mattel is competing fairly) with court assistance.  That MGA may
19   benefit from fair "competition" does not imply that MGA seeks only the protection of
     "competitors."  See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 352-53
20   (1990) (Stevens, J., dissent) ("The antitrust laws were enacted for the protection of
21   competition, not competitors.  This proposition . . . cannot be read to deny all remedial
     actions by competitors.  When competitors are injured by [conduct that violates the
22   antitrust laws] rather than by the free play of market forces, the antitrust laws protect
23   competitors precisely for the purpose of protecting competition.") (citations and quotation
     marks omitted).  Mattel additionally argues that MGA's UCL claim fails because MGA
24   has not alleged that Mattel's conduct harmed "consumers."  However, by contending that
25   Mattel's conduct inappropriately hindered inter-brand competition, MGA has necessarily
     alleged harm to consumers.  See generally Amarel, 202 Cal. App. 3d at 142 (consumers
26   benefit from "full and unrestricted competition").

27        [7] Because of this holding, the court need not address MGA's other arguments as to
28   why these paragraphs should not be stricken.

                                        17

Cal. App. 4th 895, 903 (2005) ("The [California Supreme] [C]ourt has further specified that '[t]he only nonpunitive monetary relief available . . . is the disgorgement of money that has been wrongfully obtained or, in the language of the statute, an order 'restor[ing] . . . money . . . which may have been acquired by means of . . . unfair competition.''") (quoting Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1266 (1992)). Here, MGA's UCL claim survives, and it is too early in these proceedings to determine definitively whether MGA might be entitled to restitution and disgorgement based upon its UCL-related allegations.[8] Accordingly, the court denies Mattel's motion to strike MGA's request for restitution and disgorgement.

### C. Paragraph 98 – "LeapFrog"

Mattel asserts that the court should strike paragraph 98 of the Complaint, which provides:

> Mattel has clearly engaged in tortious, illegal and unethical behavior in its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently Mattel's current *modus operandi* when it comes to "competing" in the industry. The once immensely successful "LeapFrog" interactive learning product, for example, has apparently been one of Mattel's other recent victims.

Compl. ¶ 98. Mattel argues that this paragraph should be stricken because MGA lacks standing to assert a UCL claim on behalf of LeapFrog and because the allegations are immaterial.

Mattel's arguments fail. First, MGA is not attempting to assert a claim on behalf of LeapFrog. Instead, MGA proffers its allegation regarding LeapFrog as

---

[8] The court notes, however, that the UCL does not allow for an individual to recover "disgorgement of profits allegedly obtained by means of an unfair business practice . . . where [those] profits are neither money taken from a plaintiff nor funds in which the plaintiff has an ownership interest." Korea Supply Co., 29 Cal. 4th at 1140.

1  an example of how Mattel treats its competition, of which MGA is a part.

2  Therefore, MGA need not have "standing" with respect to this allegation.

3  Moreover, at this stage of the proceedings, it would be premature to conclude that

4  the allegation is necessarily immaterial. Accordingly, the court denies Mattel's

5  motion to strike paragraph 98 of the Complaint.

6  **D. Paragraph 75 – Suing and Sending Demand Letters to Former Employees**

7  　　　　Finally, Mattel argues that the court should strike paragraph 75 (and related

8  allegations in paragraph 113) of the Complaint. Paragraph 75 provides:

> [W]ielding the litigation privilege as a potential shield for
> intimidating conduct, Mattel has sent threatening letters to several of
> its former employees who now work for MGA warning them not to
> disclose *even publicly available information* about Mattel, including
> the names and positions of Mattel employees. Mattel even went so
> far as to sue one of its former senior executives, after he had the
> temerity to resign and join MGA in October 2004. Not only was
> Mattel's lawsuit dismissed for failure to state a viable claim, but
> Mattel thereafter seemingly could not muster up a shred of evidence
> sufficient to support an amended complaint. As a result, Mattel's
> case against its former executive was dismissed with prejudice.

Compl. ¶ 75 (emphasis in original). As mentioned, these allegations, while not

capable of supporting MGA's trade dress claims, arguably support MGA's UCL

claim. See supra Part IV.B.1. Mattel argues that these allegations should

nevertheless be stricken because: (1) MGA lacks standing under the UCL to assert

such allegations; and (2) the conduct alleged in paragraph 75 is rendered

inactionable by California's "litigation privilege" and the Noerr-Pennington

doctrine.

1.　　Standing

　　　　Section 17204 of the California Business and Professions Code provides

that a party has standing to bring an action pursuant to the UCL if it "has suffered

injury in fact and has lost money or property as a result of a violation [of the

UCL]." MGA specifically alleges that as a result of Mattel's conduct, including

that alleged in paragraph 75, MGA's "ability to attract, hire, and retain employees

has been affected." Compl. ¶ 100. See also id. ¶ 113 (Mattel has . . . used its

power and influence to attempt to, if not actually, intimidate and threaten MGA's

current and potential employees so as to cause MGA competitive injury.").

Therefore, even if it is necessary for MGA to demonstrate it has "standing" to

assert the allegations in paragraph 75, MGA has adequately alleged that it "has

suffered injury in fact and has lost money or property as a result" of Mattel's

alleged conduct. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)

(where 12(b) motion to dismiss is based on lack of standing, court must defer to

plaintiff's factual allegations, and must "presume that general allegations embrace

those specific facts that are necessary to support the claim") (quotation marks

omitted). Therefore, MGA has "standing" under the UCL to assert the allegations

contained in paragraph 75.

2.    The Litigation Privilege and the Noerr-Pennington Doctrine

        Mattel argues that regardless, the conduct alleged in paragraph 75 is

inactionable under California's litigation privilege and the Noerr-Pennington

doctrine.

        California's litigation privilege is codified at section 47(b) of the California

Civil Code, which provides that "[a] privileged publication or broadcast is one

made . . . in any judicial proceeding." Cal. Civ. Code § 47(b). This privilege

applies to "any communication (1) made in judicial or quasi-judicial proceedings;

(2) by litigants or other participants authorized by law; (3) to achieve the objects

of the litigation; and (4) to have some connection or logical relation to the action."

Silberg v. Anderson, 50 Cal. 3d 205, 212 (1990).

        The Noerr-Pennington doctrine is a federal court creation. Originally, it

was "[t]he First Amendment aspect of antitrust law." Freeman v. Lasky, Haas &

20

Cohler, 410 F.3d 1180, 1183-84 (9th Cir. 2005). The doctrine was announced in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), where the Supreme Court interpreted the Sherman Act, in view of "the right of the people . . . to petition the Government for a redress of grievances," to not cover political lobbying:

> To hold that the government retains the power to act in [its] representative capacity [to make laws that operate to restrain trade] and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act. . . . [S]uch a construction of the Sherman Act would [also] raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.

Noerr Motor Freight, Inc., 365 U.S. at 137-38. "The doctrine extends to all three branches of government, and thus also exempts bringing a lawsuit – that is, petitioning a court – from antitrust liability." Freeman, 410 F.3d at 1183 (citing Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972)). To date, some courts have even applied this doctrine to immunize pre-litigation demand letters from lawsuits unrelated to antitrust law. See, e.g., DirectTV v. Lewis, No. 03-CV-6241-CJS-JWF, 2005 WL 1006030, at 5-7 (W.D.N.Y. Apr. 29, 2005).

These doctrines apply differently to MGA's allegations regarding Mattel's suing one of its former employees and its allegations regarding Mattel sending demand letters to its former employees.

### a. The *Brewer* Litigation

In the second part of paragraph 95, MGA refers to a lawsuit filed by Mattel against one of its former senior executives, Ronald Brewer, who left Mattel for

1  MGA.  In that lawsuit, Mattel sought declaratory relief that certain information
2  allegedly possessed by Brewer was confidential to Mattel and that Brewer did not
3  have the "ability . . . to undertake the responsibilities inherent in his new position
4  with MGA without disclosing or using the confidential . . . [i]nformation that [he]
5  learned while employed by Mattel."  See Mot., Ex. A (Mattel, Inc. v. Brewer,
6  Compl. ¶¶ 47, 48).[9]  The Los Angeles Superior Court dismissed Mattel's case
7  against Brewer with prejudice, and the decision is currently on appeal.  Mot. at 5.
8      Despite MGA's arguments to the contrary, its allegations regarding the
9  Brewer litigation are rendered inactionable by California's litigation privilege.
10  The Complaint essentially asserts that the Brewer lawsuit was meritless and that
11  Mattel instituted the suit simply to harass Brewer and intimidate others who might
12  consider leaving Mattel for MGA.  The initiation of such a lawsuit and the
13  statements made therein are clearly protected by the litigation privilege.  See
14  Rubin v. Green, 4 Cal. 4th 1187, 1195 (1993) ("filing the complaint and
15  subsequent pleadings in the litigation" is protected by the litigation privilege);
16  Abraham v. Lancaster Community Hospital, 217 Cal. App. 3d 796, 822 (1990)
17  ("[I]t cannot be disputed that the filing of a lawsuit is a publication in the course of
18  a judicial proceeding."); Microsoft Corp. v. BEC Computer Co., Inc., 818 F. Supp.
19  1313, 1319 (C.D. Cal. 1992) (Kenyon, J.) ("the filing of improper or meritless
20  pleadings . . . is privileged").  Thus, MGA's allegations regarding the Brewer
21  litigation are based upon privileged conduct, and such allegations are ordered
22  stricken from the Complaint.[10]

23

24      [9] The court takes judicial notice of this document.  See Parrino v. FHP Inc., 146
25  F.3d 699, 706 (9th Cir. 1998) ("a district court ruling on a motion to dismiss may consider
    a document the authenticity of which is not contested, and upon which the plaintiff's
26  complaint necessarily relies").

27      [10] MGA attempts to avoid this result by arguing that the Brewer litigation does not
28                                                                      (continued . . .)

22

### b.  Demand Letters

Paragraph 75 also includes the allegation that "Mattel has sent threatening letters to several of its former employees who now work for MGA[,] warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees."  Compl. ¶ 75 (emphasis in original).  At least at this stage in the proceedings, neither the litigation privilege nor the Noerr-Pennington doctrine provides a basis for striking this allegation.

---

provide a "basis" for its UCL claim, but merely "evidence" of Mattel's unfair business practices.  See Opp. at 20-21 (citing White v. Western Title Ins. Co., 40 Cal. 3d 870, 888 (1985) ("[There is] a careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication."); Stacy & Witbeck, Inc. v. City and County of San Francisco, 36 Cal. App. 1074, 1091 (1995) ("[A]lthough section 47, subdivision (b), bars certain tort causes of action predicated on a judicial statement or publication, it does not create an evidentiary privilege for those statements. Thus, as an example, those statements can be used for evidentiary purposes to determine a person's intent."); Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, 42 Cal. 3d 1157 (1986) (in abuse of process action, plaintiff may use statements made during settlement negotiations in prior suit as "evidence" of defendant's improper "ulterior" purpose in initiating prior suit)).  MGA, however, misrepresents the nature of its Complaint.  Reading the Complaint as a whole, it is clear that the allegations in paragraph 75 provide one of the "bases" upon which MGA rests its claim that Mattel engaged in "unfair competition."  The allegations in paragraph 75 are not mere "evidence" tending to show an element of some other cause of action, such as malicious prosecution or abuse of process.  Indeed, MGA itself appears to admit as much in a separate portion of its opposition.  See Opp. at 1-2 (describing its allegations, including those based upon the Brewer litigation, as being "at the heart of Mattel's anti-competitive behavior").  Consequently, MGA's allegations regarding the Brewer litigation are subject to the litigation privilege.  See Dong v. Board of Trustees of Leland Stanford Junior University, 191 Cal. App. 3d 1572, 1594 (1987) (documents subject to litigation privilege if they provide "the nuclei" for causes of action); Block v. Sacramento Clinical Labs, Inc., 131 Cal. App. 3d 386, 392-93 (1982) (privilege applies where litigation-related conduct is "the actionable wrong").

23

First, because this allegation relates to "pre-litigation conduct," the scope of the litigation privilege is narrowed. In particular, pre-litigation demand letters are "protected by the litigation privilege [only] when the statement is made in connection with a proposed litigation that is contemplated in good faith and under serious consideration.'" Blanchard v. DirectTV, Inc., 123 Cal. App. 4th 903, 919 (2004) (quoting Aronson v. Kinsella, 58 Cal. App. 4th 254, 262 (1997)) (citing Silberg, 50 Cal. 3d at 212; Laffer v. Levinson, Miller, Jacobs & Phillips, 34 Cal. App. 4th 117, 124 (1995); Fuhrman v. California Satellite Systems, 179 Cal. App. 3d 408, 420-21 (1986), overruled on other grounds by Silberg v. Anderson, 50 Cal. 3d 205, 212 (1990)). Here, it is at least arguable that Mattel's demand letters did not meet the "good faith" requirement because they allegedly threatened to sue former employees even if the employees disclosed only "publicly available information." Cf. Herzog v. "A" Company, Inc., 138 Cal. App. 3d 656 (1982) ("good faith" requirement not met when employer sends demand letter to former employee threatening suit if employee engages in conduct not barred by agreement between employer and former employee). See also Aronson v. Kinsella, 58 Cal. App. 4th 254, 270 (1997) (must determine whether party writing demand letter "honestly believed he had a viable legal claim"). In any event, this determination is not one that should be made on the pleadings. See, e.g., Fuhrman, 179 Cal. App. 3d at 422 (whether demand letters were sent in good faith and serious contemplation of litigation is factual question that cannot be decided on demurrer). Therefore, the litigation privilege cannot be used as a basis at this time to strike the allegations regarding Mattel's demand letters.

Second, the Noerr-Pennington doctrine, even if applicable, does not provide

a basis at this time for striking the allegations regarding Mattel's demand letters, because MGA's allegations suggest that these letters fall within the "sham" exception to the doctrine. As stated by the Ninth Circuit:

> While <u>Noerr-Pennington</u> immunity is broad, it is not so broad as to cover all litigation: "Sham" petitions don't fall within the protection of the doctrine. We have recognized three circumstances when litigation might be sham:
>
> First, if the alleged anticompetitive behavior consists of bringing a single sham lawsuit (or a small number of such suits), the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relationships.
>
> Second, if the alleged anticompetitive behavior is the filing of a series of lawsuits, "the question is not whether any one of them has merit – some may turn out to, just as a matter of chance – but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival."
>
> Finally, in the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy."

<u>Freeman</u>, 410 F.3d at 1183-84 (citations omitted).

Here, MGA's allegations suggest that the first exception is applicable: the requests in Mattel's demand letters were "objectively baseless," and the demand letters were a "concealed attempt to interfere" with MGA's business relationships. Therefore, at least at this stage in the proceedings, the court cannot say that the <u>Noerr-Pennington</u> doctrine, even if applicable, serves as a basis for striking MGA's allegations regarding Mattel's demand letters. Accordingly, the court

denies Mattel's motion to strike MGA's allegations regarding Mattel's demand letters.

## V. CONCLUSION

For the reasons set forth above, Mattel's Motion is GRANTED in part and DENIED in part. Mattel's Motion is granted insofar as it requests that MGA's allegations regarding the <u>Brewer</u> litigation be stricken; otherwise, Mattel's Motion is denied. No later than September 19, 2005, Mattel shall file an Amended Answer.

IT IS SO ORDERED.

DATED: August 25, 2005

Nora M. Manella
United States District Judge